Gary J. Smith (SBN 141393)
gsmith@bdlaw.com
BEVERIDGE & DIAMOND, P.C.
456 Montgomery Street, Suite 1800
San Francisco, CA 94104-1251
Telephone: (415) 262-4000
Facsimile: (415) 262-4040

Scott J. Sachs (SBN 213737)
ssachs@aalrr.com
ATKINSON, ANDELSON, LOYA, RUUD & ROMO
12800 Center Court Drive, Suite 300,
Cerritos, California 90703
Telephone: (562) 653-3599
Facsimile: (562) 653-3951

Attorneys for Plaintiff
Long Beach Unified School District

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LONG BEACH UNIFIED SCHOOL DISTRICT<br><br>Plaintiff,<br><br>vs.<br><br>SANTA CATALINA ISLAND COMPANY and CITY OF AVALON<br><br>Defendants. | Case No. _____<br><br>**COMPLAINT OF LONG BEACH UNIFIED SCHOOL DISTRICT**<br><br>Complaint Filed: February 14, 2019<br>_____<br>Trial Date: Not Set |

Plaintiff Long Beach Unified School District (the "School District"), by and through its attorneys, BEVERIDGE & DIAMOND, P.C. and ATKINSON, ANDELSON, LOYA, RUUD & ROMO, brings this complaint against SANTA CATALINA ISLAND COMPANY ("SCICo") and the CITY OF AVALON (the "City," collectively the "Defendants"), and alleges as follows:

**INTRODUCTION AND SUMMARY OF CLAIMS**

1. This is a civil action by the School District pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. section 9601, et seq., for the recovery of necessary response costs related to releases and threatened releases of hazardous substances by the Defendants from the properties located at 200 Falls Canyon Road (the "Avalon School Campus") and 661 Falls Canyon Road ("City Maintenance Yard," collectively, the "Site").

2. Defendants SCICo and the City previously owned or operated portions of the Avalon School Campus and contaminated these parcels through their historic on-site operations. Together they are responsible for pollution resulting from a manufactured gas plant, an electric power plant, a golf course, and burn dumps, which, upon information and belief, are the principal sources of the contamination now on School District property.

3. Given its responsibility to protect its students, teachers, employees, contractors, and other visitors, the School District began promptly assessing and removing contamination from the Avalon School Campus upon discovery. The School District has conducted numerous investigations and targeted cleanup actions since 2001 as new areas of contamination have been discovered. To date, the School District has spent over $12 million dollars in assessment and cleanup activities with more cleanup to occur in the future, and more expenses. SCICo and the City have failed and refused to reimburse the District for any portion of these costs.

4. The School District also makes claims under Section 113(g)(2) of CERCLA, 42 U.S.C. Section 9613(g)(2) and 28 U.S.C. § 2201 and 28 U.S.C. § 2202 for a declaratory judgment that the named Defendants in this action are liable to the School District for future necessary response costs incurred by the School District in responding to releases and/or threatened releases of hazardous substances at the Falls Canyon Site.

5. In addition to its CERCLA claim, the School District also seeks to recover costs pursuant to common law for equitable indemnification, contribution and nuisance.

## JURISDICTION AND VENUE

6. This Court has jurisdiction pursuant to 28 U.S.C. sections 1331 and 1345, and Section 113(b) of CERCLA, 42 U.S.C. section 9613(b).

7. This Court also has supplemental jurisdiction pursuant to 28 U.S.C. section 1367 over the state law claims because they arise out of the same transactions or occurrences that are the subject matter of the federal claims alleged by the School District.

8. Venue is proper in this judicial district pursuant to 28 U.S.C. section 1391(b) and (c), and Section 113(b) of CERCLA, 42 U.S.C. section 9613(b), because the claims arose in this district, the release or threatened release of hazardous substances that gives rise to these claims occurred in this district, and the Site is located in this district.

## PARTIES

9. The School District is, and at all times mentioned herein was, a public entity and a school district duly organized and existing under the laws of the State of California. Its offices are located at 1515 Hughes Way, Long Beach, California 90810. The School District manages approximately eighty-five schools throughout Long Beach, Lakewood, Signal Hill, and Avalon, establishing high academic standards and cultivating educational partnerships in its communities. The School District owns and operates the Avalon School Campus and is responsible for the health and welfare of its more than 500 kindergarten through high school students, as well as its faculty and staff, and the facilities and maintenance and operations division employees who serve the Avalon School Campus.

10. The School District purchased the parcels at issue from SCICo and/or the City in various transactions, including, from east to west: the site of a former Pitch and Putt golf course, where the elementary school portables are now located (the "Elementary School," sometimes called the East Parcel) in 1979, the remaining school buildings (the "Main Campus") in 1924 and 1931, and the athletic field (the "Ball Field," sometimes called the Play Field) in 1960 (together, the Avalon School Campus).

11. Upon information and belief, Defendant SCICo is a corporation organized and existing under the laws of Delaware with a principal place of business located at 150 Metropole Avenue, Avalon, California 90704. SCICo owned and operated the entire Site from the late 1800's to the 1920's, when it began selling parcels as set forth herein.

12. Upon information and belief, Defendant City is a governmental entity with offices located at 410 Avalon Canyon Road, Avalon, California 90704. Upon information and belief, the City purchased the land to the west of the Avalon School Campus (the "City Maintenance Yard") and a portion of the Ball Field from SCICo in 1920.

## DESCRIPTION OF ACTION

13. Section 107 of CERCLA, 42 U.S.C. section 9607, provides that whenever any hazardous substance, pollutant, or contaminant is released into the environment, or there is a substantial threat of a release into the environment, certain parties are liable for response costs incurred under CERCLA:

 (1) [T]he owner and operator of a vessel or a facility,

 (2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of, [and]

 (3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances[.]

14. CERCLA Section 107 makes responsible parties liable for necessary costs incurred by other parties.

15. Section 113(g)(2) of CERCLA, 42 U.S.C. section 9613(g)(2), provides that in actions for recovery of costs, "the court shall enter a declaratory judgment on liability

for response costs or damages that will be binding on any subsequent action or actions to recover further response costs or damages."

16. The School District has incurred necessary response costs and will continue to incur such costs in the future.

17. SCICo and the City were owners and operators of a facility at the time when hazardous substances were disposed of there.

18. A facility is "any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located." CERCLA 101(9).

19. The Site is a "facility" and is contaminated with a number of chemicals of concern ("COCs"), including lead, arsenic, dioxins, polycyclic aromatic hydrocarbons ("PAHs"), BTEX, and cyanide.

20. In 2012, the Department of Toxic Substances Control ("DTSC") issued an Imminent and Substantial Endangerment Determination Order and Remedial Action Order (the "DTSC Order") ordering the cleanup of the Site. The DTSC Order includes SCICo and the City as responsible parties or liable persons for the contamination at the Site.

21. To address the contamination, DTSC has divided the Site into two operable units ("OUs") as depicted on the figure below: OU-1 includes the Main Campus and the Elementary School, where arsenic, lead, and dioxins are the COCs, and OU-2 includes the Ball Field (OU-2A) and the City Maintenance Yard (OU-2B), where arsenic, lead, PAHs, and dioxins are the COCs. BTEX and cyanide have also been identified as COCs for both OUs.

///
///
///
///
///



## HISTORY OF THE SITE

22. Upon information and belief, in 1894, William, Hancock and Joseph Bannin incorporated SCICo and started development activity on the Site.

23. Upon information and belief, the City purchased the City Maintenance Yard from SCICo in or about 1919 and began construction of a manufactured gas plant ("MGP") on the Site. The plant began operating in or about 1920 and operations continued through approximately 1931. The MGP was operated by both the City and SCICo at different times.

24. Upon information and belief, in 1920, the City had a 30,000 cubic foot above ground gas storage tank (also referred to as a "gas holder") constructed on the middle of what is now the Ball Field, and by 1930 SCICo had added a 50,000 cubic foot

gas holder.

25. Upon information and belief, carbon furnaces for the MGP were located on what is now the northwestern corner of the Ball Field.

26. Upon information and belief, the wastes from the MGP, which contained PAHs and other COCs, were disposed of by the City and SCICo on the Site and have come to be located at the Ball Field and other locations on the Avalon School Campus.

27. Upon information and belief, in or about 1920 the City began operating an electric generating plant on the City Maintenance Yard near the current Avalon School Campus boundary, consisting of several diesel powered electrical generators. Operation of the plant was later taken over by SCICo.

28. Upon information and belief, the electric generating plant continued operating on Site until in or about 1947. Upon information and belief, the diesel fuel tanks continued to be used for fuel storage until they were removed in about 1958.

29. Upon information and belief, wastes from the electric generating plant, which normally would include PAHs and other hydrocarbons, were disposed of by the City and SCICo on the Site and have come to be located at various places on the Avalon School Campus.

30. Upon information and belief, waste from burn dumps, which contains lead, dioxin and other COCs, was disposed of on the Site at some point prior to 1924. The School District learned of the existence of the burn dump waste in approximately 2008.

31. Upon information and belief SCICo graded the Main Campus that is today occupied by the High School, Library, and Elementary School buildings and surrounding playground and courtyards. The fill material graded by SCICo contained burned dump waste and other COCs.

32. Upon information and belief, in 1924 SCICo constructed the High School building on this graded fill. In 1927 and thereafter, the School District constructed what is now the Library, the Elementary School building, and other buildings on this contaminated fill material placed by SCICo.

33. Upon information and belief, in the mid-1960's, several small houses, which were built before approximately 1926 on what is now the Ball Field and owned by SCICo, burned down, and the rubble from the houses, including lead-painted surfaces, was included in fill ultimately used for the Ball Field.

34. On information and belief, SCICo used and disposed of rodenticides containing arsenic on the golf course that the company operated where the Elementary School portables are now located.

35. In June 2001, during a school modernization project on the Avalon School Campus involving trenching in the south playground area behind the library and elementary school buildings, a School District contractor identified contaminated soil, which had elevated levels of dioxins, lead, and arsenic. Additional samples taken from the Ball Field identified elevated levels of PAHs.

36. In October 2001, the School District began an assessment of the Avalon School Campus, investigating the contamination, and conducting removal actions to protect its students, employees, and the public pursuant to a Voluntary Cleanup Agreement with the DTSC.

37. In August 2003, the School District prepared a plan for the Avalon School Campus portion of the Site to address impacts that had been identified by the School District's contractor during subsurface investigations conducted at the site through that date.

38. In June 2005, the School District submitted to DTSC a cleanup plan for the Avalon School Campus portion of the Site, identifying soil removals and temporary caps as appropriate interim cleanup actions to be taken in certain areas at the Site. The plan made clear that additional investigation was required and would be forthcoming in order to adequately characterize and clean up of the Site.

39. In the summer of 2005, the School District removed 2,126 tons of soil containing hazardous substances from the Avalon School Campus portion of the Site.

40. In April 2007, as the understanding of the Site continued to evolve, the

School District entered into a new Voluntary Cleanup Agreement with DTSC.

41. In July 2007, the School District submitted to DTSC a Supplemental Site Investigation Work Plan for the Avalon School Campus portion of the Site.

42. In January 2008, the School District submitted to DTSC a Supplemental Site Investigation Report identifying data gaps in the characterization of the Avalon School portion of the Site identifying areas with COC impacted soil.

43. In January 2009, the School District removed 40 cubic yards of COC-contaminated soil from the western Ball Field slope.

44. In March 2010, the School District prepared a revised soil removal technical memorandum due to additional contamination having been identified in the areas of the student locker rooms and courtyard areas of the Avalon School Campus portion of the Site.

45. In July 2010, the School District removed 130 cubic yards of soil from the locker room courtyard area.

46. In March 2012, DTSC issued the DTSC Order naming the City, SCICo, and the School District (the "Parties") as respondents in the matter of the cleanup of the Site.

47. The DTSC Order notes the removal actions carried out at the Site by the School District, but recognizes that "the nature and extent of contamination on the Site ha[d] not been fully identified" and required the parties to conduct a remedial investigation and feasibility study and to prepare a remedial action plan for the Site.

48. Effective May 9, 2012, the Parties entered into a Tolling and Standstill Agreement ("Tolling Agreement") under which the statute of limitations for "any and all rights, claims, causes of action, counterclaims, third party claims, cross-claims and defenses that could or might be asserted by the Parties, one or more of them that are based on, or arise out of, the [DTSC] Order, including the work required under the [DTSC] Order" are tolled.

49. In August 2014, the School District removed 210 tons of PAH-impacted soil from the southwest corner of the Ball Field slope area.

50. In August 2015, the School District conducted a supplemental investigation and identified additional COCs above cleanup goals in a number of areas of the campus, including the shop, library, high school, auditorium, elementary school, and administrative buildings.

51. In January 2017, the Parties submitted a human health risk assessment report for the Avalon School Campus and City Maintenance Yard areas to DTSC. The report identified arsenic as a site-wide COC, lead as a COC for OU-1, and PAHs as COCs for OU-2.

52. In February 2017, the DTSC approved the Parties' human health risk assessment report and determined that a work plan was needed to address the contamination at the Site.

53. In May 2017, SCICO's consultant prepared and submitted to DTSC on behalf of the Parties a Technical Memorandum for a proposed remedial approach for the contamination located on the Avalon School Campus.

54. In June 2017, the DTSC approved a Technical Memorandum describing hot spot removal of arsenic and other COCs, as well as pre-excavation confirmation sampling to determine general excavation limits.

55. In August 2017 and January and February 2018, the School District conducted additional investigation and classification as approved by DTSC.

56. The School District has significant renovations planned to modernize the Avalon School Campus which would substantially benefit both the School and its students. Current plans propose soil excavation for utility upgrades in identified hot spots. Additionally, the School District plans to provide a new play field for the Avalon School students. In the longer term, the School District intends to replace many of the existing school buildings, which will expose areas of contaminated soil that will require remediation.

57. In order to be protective of students, faculty, staff, facilities, maintenance and operations division employees, and construction workers who will be working on the

1 currently planned renovations, the School District has determined that COC hot spots in soil within five feet of the surface in paved and unpaved areas must be removed.

58. SCICo and the City have refused to reimburse the School District for its past costs in investigating and cleaning up the contamination resulting from their operations and have opposed approval of a work plan for the necessary cleanup, causing significant delay in the Avalon School's modernization and Ball Field project, which will drive up the costs of the project.

**FIRST CLAIM FOR RELIEF AGAINST ALL DEFENDANTS**
**(COST RECOVERY PURSUANT TO CERCLA, 42 U.S.C. § 9607)**

59. The School District alleges and incorporates by reference the allegations of Paragraphs 1 through 58 as though fully set forth herein.

60. The Site is a "facility" within the meaning of Section 101(9) of CERCLA, 42 U.S.C. section 9601(9).

61. Certain compounds found at the Site, such as PAHs, arsenic, lead, and dioxin, are "hazardous substances" as defined by Section 101(14) of CERCLA, 42 U.S.C. section 9601(14).

62. There has been a "release" or "threatened release" by the Defendants of hazardous substances at or from the Site within the meaning of Section 101(22) of CERCLA, 42 U.S.C. section 9601(22).

63. Each Defendant is a "person" within the meaning of Section 101(21) of CERCLA, 42 U.S.C. section 9601(a).

64. Each Defendant owned and/or operated all or a portion of the Site at the time of disposal of one or more hazardous substances at the Site.

65. Each Defendant arranged for disposal of one or more hazardous substances at property now owned by the School District.

66. Each Defendant caused and/or contributed to the release or threatened release of a hazardous substance from the facility.

67. To address the releases or threatened releases of hazardous substances from

the Site, the School District has conducted response actions and incurred necessary response costs, within the meaning of Section 101(25) of CERCLA, 42 U.S.C. section 9601(25).

68. The response actions by the School District at the Site and the costs incurred in relation to such response actions were necessary and consistent with and not inconsistent with the relevant portions of the National Contingency Plan ("NCP"), 40 C.F.R. Part 300.

69. Each of the Defendants is liable, jointly and severally, pursuant to Section 107(a) of CERCLA, 42 U.S.C. section 9601(a), for all of the School District's response costs incurred at or in the Site.

## SECOND CLAIM FOR RELIEF AGAINST DEFENDANTS
## (DECLARATORY RELIEF UNDER 42 U.S.C. § 9613)

70. The School District alleges and incorporates by reference the allegations of Paragraphs 1 through 69 as though fully set forth herein.

71. Section 113(g)(2) of CERCLA, 42 U.S.C. section 9613(g)(2), provides that "the court shall enter a declaratory judgment on liability for response costs or damages that will be binding on any subsequent action or actions to recover further response costs or damages."

72. The School District's response actions at the Site are ongoing, and it expects to incur substantial response costs in the future.

73. The School District seeks a declaratory judgment that the Defendants are liable, without regard to fault, to the School District in any subsequent action for future response costs incurred at the Site by the School District.

## THIRD CLAIM FOR RELIEF AGAINST DEFENDANTS
## (DECLARATORY RELIEF UNDER 28 U.S.C. § 2201 AND 28 U.S.C. § 2202)

74. The School District alleges and incorporates by reference the allegations of Paragraphs 1 through 73 as though fully set forth herein.

75. An actual controversy of a justiciable nature has arisen and now exists between the School District and Defendants.

    a. The Defendants are liable in whole or in part for the response costs and other damages that have been or are to be incurred by the School District as a result of the allegations in the Complaint.

    b. The Defendants have refused to accept responsibility for the alleged contamination in whole or in part.

76. A judicial determination of the present and future rights and obligations of the parties is necessary and appropriate at this time in order that the parties may determine their respective rights and obligations, and the School District requests such a determination be made as authorized by common law, equity, and the laws of the State.

## FOURTH CLAIM FOR RELIEF AGAINST DEFENDANTS
## (EQUITABLE INDEMNITY AND CONTRIBUTION)

77. The School District alleges and incorporates by reference the allegations of Paragraphs 1 through 76 as though fully set forth herein.

78. While denying any liability on the part of the School District, to the extent the School District has any present or future liability for the contamination at the Site, it would be based in whole or in part on the negligent or culpable acts or omissions of the Defendants.

79. The Defendants' acts or omissions directly caused or contributed to the alleged contamination at the Site.

80. The School District has incurred costs and suffered damages as a result of the Defendants' acts or omissions.

81. The School District is entitled to equitable indemnity and contribution from Defendants on a comparative basis for all damages, response costs, cleanup costs, expenditures, and any other costs or liability incurred or to be incurred as a result of allegations in this Complaint.

## FIFTH CLAIM FOR RELIEF AGAINST DEFENDANTS
## (CONTINUING PUBLIC AND PRIVATE NUISANCE)

82. The School District alleges and incorporates by reference the allegations of Paragraphs 1 through 81 as though fully set forth herein.

83. The acts and omissions of Defendants cause an interference with the School District's use and enjoyment of its property.

84. The interference with the use and enjoyment of the land is substantial and the School District has suffered substantial actual damage.

85. The nature, duration, and/or amount of acts and omissions of Defendants as alleged herein were unreasonable, negligent, and/or careless, and have resulted in a breach of Defendants' duties as prescribed by law.

86. A new cause of action for this continuing nuisance accrues each day that the nuisance remains unabated.

87. The nuisance can be abated or remediated at reasonable cost, but Defendants have failed and refused to do so.

88. The Defendants' acts and omissions have unreasonably interfered with the comfortable use and enjoyment of the Site, which is a public school serving students from the entire Avalon community, and therefore constitute a continuing public nuisance under the laws of the State of California.

89. The seriousness of the harm caused by Defendants' acts and omissions outweighs any social utility.

90. Defendants are responsible for abatement of the continuing public nuisance and for damages resulting from the nuisance, including physical injury to the Site, the cost of protective measures to minimize future damages, the cost of abatement of the nuisance, the costs associated with investigating and remediating and restoring the Site, the increase in maintenance, operation, and construction costs attributable to the presence of contamination, and for other general and special damages in an amount not yet fully ascertained but in excess of the jurisdictional amount of this Court.

# PRAYER FOR RELIEF

WHEREFORE, Plaintiff Long Beach Unified School District prays for relief as follows:

A. For a judgment that the Defendants are jointly and severally liable to the School District for all past response costs incurred and other damages suffered by the School District as a result of the release and threatened release of hazardous substances at the Site, in an amount exceeding $12 million plus prejudgment interest;

B. For a permanent injunction requiring the Defendants to abate the nuisance;

C. For a declaratory judgment that the Defendants are jointly and severally liable to the School District for all future response costs incurred by the School District as a result of the release and threatened release of hazardous substances from the Site;

D. For costs of this suit and attorney's fees;

E. And for all other relief the Court deems just and proper.

Dated:  February 14, 2019          BEVERIDGE & DIAMOND, P.C.


                                    By: /s/ Gary J. Smith
                                        Gary J. Smith

                                    456 Montgomery Street, Suite 1800
                                    San Francisco, CA 94104-1251
                                    (415) 262-4000
                                    gsmith@bdlaw.com
                                    afamili@bdlaw.com

ATKINSON, ANDELSON, LOYA,
RUUD & ROMO
Scott J. Sachs
12800 Center Court Drive, Suite 300,
Cerritos, California  90703
(562) 653-3599
ssachs@aalrr.com

Attorneys for Plaintiff
Long Beach Unified School District