**O**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LONG BEACH UNIFIED SCHOOL DISTRICT,<br><br>　　　　　　　　　Plaintiff,<br><br>　　　v.<br><br>SANTA CATALINA ISLAND COMPANY and CITY OF AVALON,<br><br>　　　　　　　　　Defendants. | Case No.: 2:19-cv-01139-MEMF-AS<br><br>**ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [ECF NO. 222] AND GRANTING IN PART PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT [ECF NO. 225]** |

Before the Court is a Motion for Summary Judgment filed by Defendants Santa Catalina Island Company and City of Avalon (ECF No. 222) and a Motion for Partial Summary Judgment filed by Plaintiff Long Beach Unified School District (ECF No. 225). For the reasons stated herein, the Court hereby DENIES Defendants' Motion for Summary Judgment and GRANTS IN PART Plaintiff's Motion for Partial Summary Judgment.

/ / /

/ / /

/ / /

1

**I.    Background**

     **A. Factual Background**

Plaintiff Long Beach Unified School District ("LBUSD") owns and operates the Avalon School Campus, composed of land parcels purchased from Defendants Santa Catalina Island Company ("the Island Company") and City of Avalon (the "City," and, collectively, "Defendants") in various transactions throughout the 1900s. This case concerns LBUSD's allegations that Defendants' prior ownership and operation of the properties that eventually came to be the Avalon School Campus caused contamination of toxic substances that LBUSD has been, and continues to, remediate.

     **B. Procedural History**

On February 14, 2019, LBUSD filed its Complaint alleging: (1) cost recovery pursuant to the Comprehensive Environmental Repsonse, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9607; (2) declaratory relief under 42 U.S.C. § 9613; (3) declaratory relief under 28 U.S.C. §§ 2201, 2202; (4) equitable indemnity and contribution; and (5) continuing public and private nuisance. ECF No. 1 ("Compl.").[1]

On May 17, 2021, Defendants filed a Motion for Partial Summary Judgment on LBUSD's first four causes of action, and partially on the fifth cause of action. ECF No. 76. On August 17, 2021, Judge John Walter issued an order granting Defendants' Motion for Partial Summary Judgment in its entirety. ECF No. 114. As a result, the only surviving claim is LBUSD's claim for private nuisance. *Id.* at 18. Moreover, LBUSD's claim for continuing private nuisance is limited to recovery for damages sustained after February 14, 2016. *Id.* at 18.

On February 10, 2022, the case was reassigned to this Court. ECF No. 177. On June 6, 2023, Defendants sought leave to file a second motion for summary judgment, which the Court granted on July 21, 2023. ECF Nos. 209, 215.

---

[1] Although not directly at issue here, the Island Company has brought counterclaims against LBUSD and crossclaims against the City. ECF No. 10. The City has also brought counterclaims against LBUSD and crossclaims against SCIC. ECF No. 13. In response to Defendants' counterclaims, LBUSD has also asserted a contribution counterclaim under CERCLA. ECF No. 203.

On October 14, 2023, Defendants filed the instant Motion for Summary Judgment ("MSJ") on LBUSD's remaining cause of action. ECF No. 222. Pursuant to the Court's Standing Order, the parties submitted a Joint Statement of Facts (ECF No. 222 ("SUF")),[2] a Joint Memorandum of Points and Authorities (ECF No. 222-1 ("MPA")), and a Joint Evidentiary Appendix (ECF No. 222-3 ("Evidentiary Appendix")).[3] Defendants also filed evidentiary objections, which LBUSD filed a response to. ECF Nos. 222-2 ("Evidentiary Objections"), 238 ("Response to Evidentiary Objections").

Also on October 14, 2023, LBUSD filed the instant Motion for Partial Summary Judgment ("MPSJ") on portions of Defendants' affirmative defenses. ECF No. 225. The parties submitted Joint Statements of Facts (ECF Nos. 225-1, 225-2), a Joint Memorandum of Points and Authorities (ECF No. 225-3) ("PMPA"), and a Joint Evidentiary Appendix (ECF No. 226).[4] Defendants filed evidentiary objections, to which LBUSD filed a response. ECF Nos. 225-6, 225-7. The Motion was heard before the Court on November 16, 2023.

## II.   Applicable Law

### A.   Motions for Summary Judgment

Summary judgment should be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those that may affect the outcome of the case. *Nat'l Ass'n of Optometrists & Opticians v. Harris*, 682 F.3d 1144, 1147 (9th Cir. 2012) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Liberty Lobby*, 477 U.S. at 248.

A court must view the facts and draw inferences in the manner most favorable to the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Chevron Corp. v. Pennzoil*

---

[2] The Court will refer to Defendants' and LBUSD's Statement of Facts in connection with Defendants' MSJ as DSUF and PSUF respectively. The Court will refer to Defendants' and LBUSD's Statement of Facts with regards to LBUSD's MPSJ as D2SUF and P2SUF respectively.

[3] Defendants also filed various declarations in support of their MSJ. ECF Nos. 223, 230, 231, 232, 233, 234, 235, 236.

[4] LBUSD also filed various declarations in support of their MPSJ. ECF Nos. 227, 228, 229.

*Co.*, 974 F.2d 1156, 1161 (9th Cir. 1992). "A moving party without the ultimate burden of persuasion at trial—usually, but not always, a defendant—has both the initial burden of production and the ultimate burden of persuasion on a motion for summary judgment." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). To carry its burden of production, the moving party must either: (1) produce evidence negating an essential element of the nonmoving party's claim or defense, or (2) show that there is an absence of evidence to support the nonmoving party's case. *Id.*

Where a moving party fails to carry its initial burden of production, the nonmoving party has no obligation to produce anything, even if the nonmoving party would have the ultimate burden of persuasion at trial. *Id.* at 1102–03. In such cases, the nonmoving party may defeat the motion for summary judgment without producing anything. *Id.* at 1103. However, if a moving party carries its burden of production, the burden shifts to the nonmoving party to produce evidence showing a genuine dispute of material fact for trial. *Liberty Lobby*, 477 U.S. at 248–49. Under these circumstances, the nonmoving party must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is no genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (internal quotation marks omitted). If the nonmoving party fails to produce enough evidence to create a genuine issue of material fact, the motion for summary judgment shall be granted. *Id.* at 322 ("Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.").

A party cannot create a genuine issue of material fact simply by making assertions in its legal papers. *S.A. Empresa de Viacao Aerea Rio Grandense v. Walter Kidde & Co.*, 690 F.2d 1235, 1238 (9th Cir. 1982). Rather, there must be specific, admissible evidence identifying the basis for the dispute. *See id.* "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact . . . the court may . . . consider the fact undisputed." Fed. R. Civ. P. 56(e)(2). The Court need not "comb the record" looking for other evidence; it is only

required to consider evidence set forth in the moving and opposing papers and the portions of the record cited therein. *Id.* 56(c)(3); *Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001). The Supreme Court has held that "[t]he mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for [the opposing party]." *Liberty Lobby*, 477 U.S. at 252. To carry its ultimate burden of persuasion on the motion, the moving party must demonstrate that there is no genuine issue of material fact for trial. *Nissan Fire*, 210 F.3d at 1102; *Celotex Corp.*, 477 U.S. at 323.

### III.  Findings of Fact[5]

The Court finds that the following material facts are established for trial under Federal Rules of Civil Procedure 56(a) and 56(g).

#### A.  The School Site

LBUSD owns and operates the Avalon School, a public K-12 school located at the entrance to Falls Canyon on Santa Catalina Island. DSUF 1. The Avalon School consists of the main campus where the school buildings are located (the "Campus") and a large athletic field (the "Ball Field") located on the western portion of the property (collectively, the "Site"). DSUF 2.

LBUSD began acquiring individual parcels from Defendants that make up the entire school property beginning in 1924 and continuing through 1979. DSUF 3. Specifically, LBUSD acquired the majority of the parcels from the Island Company, and one parcel from the City. DSUF 3. Construction of the school itself also began in 1924. DSUF 4. In June 2001, LBUSD first discovered contaminated soil, impacted with lead and dioxins, on the Site. DSUF 5. In 2012, the Department of Toxic Substances Control ("DTSC") ordered that the parties develop an investigation and

---

[5] The facts set forth below are taken from the parties' respective Statements of Uncontroverted Facts and the submitted evidence. *See* ECF No. 222. To the extent that any statements of fact are omitted, the Court concludes they are not material to the disposition of this Motion. To the extent that any of the facts set below were allegedly disputed by the opposing party, the Court concludes that no actual dispute exists or that the adopted language resolves the dispute.

In making these Findings of Fact, the Court considered Defendants' Evidentiary Objections and LBUSD's response thereto. ECF Nos. 222-2, 238. The Court did not find any evidence objected to essential to finding any fact stated herein, and therefore need not reach the Evidentiary Objections.

remediation strategy, which they have done. PSUF 62, 63. DTSC has approved both the remedial

goals and the selected remedy as decided by the parties. PSUF 64.

LBUSD's claim is focused on three alleged contamination-causing activities:

1. Prior to 1924, and before LBUSD's ownership of any portion of the Site, alleged dumping and burning of refuse at the Site.

2. Defendants' operation of a manufactured gas plant ("MGP") from 1920 to 1931, which LBUSD claims affected the Ball Field LBUSD came to own in 1960.

3. Defendants' alleged application of arsenical herbicides and pesticides on a Pitch-and-Putt it operated from 1928 to 1979, which LBUSD claims affected an area of the Site it came to own in 1979.

*See* ECF No. 225-2 (Statement of Facts as to MPSJ), No. 37.

**B. Historical Dumping Practices**

From the 1890s to the 1920s, it was common for people to burn their trash in their own backyards. DSUF 21. In the period from 1900 to 1929, the easiest method of disposing of rubbish, trash, and weeds was by burning. DSUF 22. Dumping garbage, rubbish, and ashes on nearby, low-lying lands (and particularly canyons) was common practice in the first decades of the twentieth century. DSUF 23. These practices were sometimes more than convenient—they were preferable, particularly in small communities where low lands and excavated areas needed filling, and roads needed raising and grading—the waste and ashes provided an economically ideal solution and became a useful construction material in such endeavors. DSUF 23; DSUF 45. Historical garbage and refuse disposal practices on Santa Catalina Island varied over time and fell within the range of what were considered common disposal methods during the early twentieth century, specifically including dumping or burning garbage and refuse on low-lying lands. DSUF 24.

While ash and debris were likely encountered during construction of the school buildings in the 1920s, 1930s, and 1950s, and LBUSD's grading of the Ball Field in 1960, there would have been little to no awareness at the time that these materials may have posed any health threat. DSUF 44. By 1988, there began to be much more public awareness of the hazards of solid waste, such that when

1    ash and debris were discovered during a construction project at the site in 1988, LBUSD for the first

2    time directed its contractor to remove those materials from the site. DSUF 46.

3        **C.  Historical Use of Arsenics**

4        Beginning in 1928, the Island Company, and later the City, operated a Pitch-and-Putt golf

5    course on what is now an area of the Avalon School. PSUF 149. The Island Company began leasing

6    the Pitch-and-Putt to the City no later than 1963, and the City later subleased the Pitch-and-Putt.

7    PSUF 150. During the time when Defendants operated the Pitch-and-Putt, between 1928 and at least

8    1980 and potentially until 1986, it was common for golf courses to use arsenicals for pest, weed, and

9    crabgrass control. DSUF 48; PSUF 154. The U.S. Department of Agriculture recommended the use

10   of arsenical products for weed control in the 1960s. DSUF 47. Golf courses frequently have elevated

11   soil levels of arsenic due to historical arsenical herbicide and pesticide use. DSUF 49.

12       **D.  Historical Operation of Manufactured Gas Plant**

13       Defendants operated a MGP on a property either on or close to the property that became the

14   Ball Field at different times during the approximate period of 1920 to 1931. DSUF 34. In the mid-

15   1800s and early 1900s, before natural gas was available as an energy source, MGPs existed

16   throughout the United States. DSUF 35. MGPs used coal and oil to produce gas for lighting, heating,

17   and cooking. DSUF 35. The use of crude oil to manufacture gas was consistent with how MGPs

18   historically operated. DSUF 50. As was typical of MGPs in the early 20th century, the MGP at issue

19   produced waste byproducts, otherwise known as "lampblack." DSUF 43; PSUF 132. Many MGPs

20   would dispose of lampblack rather than recover it. DSUF 51.

21       Approximately 289 tons of contaminated dirt has been excavated from the Ball Field to date.

22   PSUF 142. There is a high correlation in composition between the lampback excavated from the Ball

23   Field and the lampback that was generated from operation of the MGP. PSUF 139.

24   **IV.   <u>Discussion</u>**

25       Defendants seek summary judgment on LBUSD's remaining claim of private nuisance (Fifth

26   Cause of Action). For the reasons set forth below, the Court DENIES summary judgment as to

27   Defendants' MSJ.

28

1    LBUSD seeks summary judgment on certain affirmative defenses by Defendants. The Court

2    GRANTS IN PART, for the reasons discussed below, LBUSD's MPSJ.

3    **A.    Defendants are not entitled to summary judgment on the nuisance claim**

4        Defendants set forth three main arguments in moving for summary judgment on LBUSD's

5    remaining private nuisance claim. Defendants argue that (1) any alleged nuisance was not caused by

6    any of their actions or failure to act; and (2) that they did not act negligently or unreasonably.

7    Separately, Defendants argue that the nuisance is not abatable, and therefore does not qualify as a

8    continuing nuisance. For the reasons discussed below, the Court finds that there is a material dispute

9    of fact as to all of the essential elements of a nuisance claim. Accordingly, Defendants cannot prevail

10   on their motion.

11       California law defines nuisance as "[a]nything which is injurious to health . . . or is indecent

12   or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the

13   comfortable enjoyment of life or property." Cal. Civ. Code § 3479. The interference or invasion

14   must be substantial and unreasonable. *See San Diego Gas & Electric Co. v. Superior Court*, 13 Cal.

15   4th 893, 938 (1996). It appears undisputed that the soil contamination complained of by LBUSD is a

16   nuisance in its current state. The question is whether the Defendants are liable for any of it.

17                  i.    <u>There is a material dispute as to whether Defendants acted or failed to act</u>

18       To be liable for the nuisance at issue, LBUSD must show that Defendants acted or failed to

19   act in a way that created the nuisance. *San Diego Gas & Electric Co. v. San Diego Regional Water*

20   *Quality Control Bd.*, 36 Cal. App. 5th 427, 436 (2019) ("A connecting element to the prohibited

21   harm must be shown."). LBUSD has alleged that Defendants (1) dumped and burned garbage at the

22   Site or allowed it to happen; (2) used arsenical pesticides on the Site in operating a Pitch-and-Putt;

23   and (3) operated a MGP that produced contaminants. MPA at 10. Defendants' first argument is that

24   LBUSD cannot show that the Defendants did (or failed to do) any of these things. Defendants

25   repeatedly assert that LBUSD has "no evidence" of the Defendants' actions or awareness of the

26   actions of others, but it appears that Defendants' true complaint is that LBUSD appears to have little

27   *direct* evidence. Defendants' focus on the existence of direct evidence is misplaced. A "plaintiff may

28   prove his case by direct or circumstantial evidence," and the Court finds that there is ample

circumstantial evidence from which a reasonable jury could find that Defendants' actions did cause the current contamination on the Site. *See U.S. Postal Service Bd. of Governors v. Aikens*, 460 U.S. 711, 714 n.3 (1983) (explaining that a "plaintiff may prove his case by direct or circumstantial evidence"). Accordingly, LBUSD has shown that there is a genuine issue of material fact as to whether the Defendants caused the current contamination by dumping and burning garbage at the Site or allowed such dumping and burning to occur, using arsenical pesticides in operating a Pitch-and-Putt, and/or operating a MGP.

### 1. Dumping and burning of garbage

As an initial matter, there is evidence suggesting that the Site was used as a burn dump at the time that Defendants owned it. PSUF 78. LBUSD points to extensive facts from forensic and archaeological evidence, an interview with a resident, and photographs and documents that reflect that the Site was in fact used for trash disposal and burning. *See* PSUF 93-127.[6] More specifically, LBUSD has presented evidence that this likely took place at the time that Defendants owned the property—for example, the parties do not dispute that approximately 75% of the dateable historical artifacts found at the Site were manufactured from 1888-1923, pre-dating LBUSD's ownership of the Site. PSUF 105-106. LBUSD has also presented a photo from 1900-1909, when Defendants owned the Site, that shows what LBUSD interprets as a smoke plume emanating from Falls Canyon. PSUF 113.

Although Defendants argue that there is no direct evidence showing that they engaged, or allowed, dumping and burning of garbage at the Site, the Court does not find that such "direct," black and white evidence is necessary to create a triable issue of fact. LBUSD has presented evidence that Defendants performed certain municipal functions, including garbage and waste disposal. PSUF 89, 90, 91. A deed for property in Falls Canyon specifically between Defendants gave an easement related to operating a garbage disposal plant. PSUF 116. LBUSD has also presented evidence that Defendants did burn and dump trash in other parts of Catalina Island. PSUF

---

[6] To the extent that Defendants dispute that there was a burn dump on the Site at all, the Court finds that these facts are materially in dispute.

1  119, 120. Moreover, Defendants agree that the dumping and burning of trash was common at the

2  time—therefore, a jury could reasonably infer that Defendants knew that it was happening. The

3  Court finds it a reasonable inference, and not speculation, that as the owners of the Site, if such

4  dumping and burning of refuse was happening, Defendants were either responsible for such

5  activities or aware and allowed it to happen.

6        Accordingly, Defendants have not met their burden in showing no dispute of material fact as

7  to whether they were aware of or caused historical dumping and burning at the Site.

8  *2.   Use of arsenical products at the Pitch-and-Putt*

9        The parties do not dispute that Defendants operated a Pitch-and-Putt golf course on an area

10  of the Site. PSUF 147-150. The parties also do not dispute that at the time that Defendants operated

11  the Pitch-and-Putt, arsenical pesticides and herbicides were commonly used at golf courses. PSUF

12  154. LBUSD has submitted that an analysis of areas of the Site with elevated arsenic levels

13  compared to locations of former Pitch-and-Putt greens shows a correlation between the two. PSUF

14  153. Here, the Court finds it reasonable to infer that the elevated arsenic levels came from the use of

15  arsenical pesticides and herbicides. It is also reasonable to infer that the use of arsenical pesticides

16  and herbicides came from the former operation of the property, especially given that previously, the

17  site was operated as a golf course. Finally, given that Defendants operated the golf course, it is

18  reasonable to infer that they caused such usage. Defendants argue that there is evidence that LBUSD

19  itself has also used arsenics on the Site, and LBUSD has not shown why it is more likely that the

20  arsenic came from Defendants rather than them. MPA at 34. However, that is not the burden

21  LBUSD has at this stage—Defendants point out exactly what LBUSD has done, which is to show a

22  material dispute as to the facts of who is responsible for the elevated arsenic levels on the Site.

23        Accordingly, Defendants have not met their burden in showing there is no reasonable dispute

24  as to whether they caused, or allowed to be caused, the contamination arising from the arsenic.

25

26  ///

27  ///

28  ///

*3.  Contamination from manufactured gas plant*

It is undisputed that Defendants operated a MGP in Falls Canyon from 1920 to 1938. PSUF

128, 130.[7] It is also undisputed that this MGP, like other MGPs, generated lampblack. PSUF 132.

Finally, it is undisputed that the lampback on the Ball Field likely came from the MGP historically

operated by Defendants. PSUF 139. The Court finds that these facts are sufficient to allow a jury to

draw a reasonable inference that Defendants caused the contamination. Defendants present evidence

that LBUSD graded the Ball Field in 1960, and argue that any contamination now on the Ball Field

was moved by LBUSD itself in this grading. MPA 22. While this may be a viable theory for

Defendants to pursue at trial, at the summary judgment stage, Defendants do not meet their burden

by merely presenting an alternate theory—even if there may be more facts supporting it. The weight

given to these facts, and which theory is more plausible, is to be determined by the trier of fact.

Here, however, the Court must draw all inferences in the light most favorable to LBUSD, and

therefore finds it in dispute whether Defendants caused the contamination on the Ball Field.

Accordingly, Defendants have not met their burden in showing there is no reasonable dispute

of material fact as to whether their operation of the MGP caused the lampback currently on the Site.

  ii. <u>There is a genuine dispute of fact as to whether Defendants acted
intentionally, creating an unreasonable interference</u>

The parties dispute one key element of a private nuisance claim under California law. A

private nuisance claim requires a showing that a defendant's interference[8] was: (1) "intentional and

unreasonable," (2)  "unintentional but caused by negligent or reckless *conduct*," or (3) the "result [of

an] abnormally dangerous activity for which there is strict liability." *Lussier v. San Lorenzo Valley

Water Dist.*, 206 Cal. App. 3d 92, 100 (1988) (emphasis added); *see also* Judicial Council of

California Civil Jury Instructions No. 2021 (2023 edition). LBUSD does not appear to argue that

---

[7] However, the parties do dispute whether the MGP was located on property that became the Ball Field, or just northwest of the Ball Field. DSUF 34; PSUF 131.

[8] The case law appears to use "interference" and "invasion" interchangeably. *See Lussier*, 206 Cal. App. 3d at 200 (stating that "an action for a private nuisance is designed to redress a substantial and unreasonable *invasion* of one's interest in the free use and enjoyment of one's property" and later, that "it is settled that where negligent conduct . . . also *interferes* with another's free use and enjoyment of his property, nuisance liability arises") (emphasis added).

Defendants are liable under the second or third prongs; accordingly, the Court will focus on the first prong—whether the invasion at issue was "intentional and unreasonable."

The main dispute between the parties stems from whether the unreasonableness referenced in the jury instructions and California case law applies to a defendant's *conduct*, or the *interference* itself. Although Defendants argue, in reliance on *Lussier*, that they are only liable if their *conduct* was unreasonable (by reference to the ordinary observer at the time), this is contrary to binding authority. The Ninth Circuit has addressed this question and held that "[a]n intentional but not unreasonable *act* can give rise to nuisance liability if it creates an unreasonable *interference*." *Redevelopment Agency of City of Stockton v. BNSF Railway Co.*, 643 F.3d 668, 673 (9th Cir. 2011) (second emphasis added).[9]

In *BNSF*, the Ninth Circuit stated that if a defendant "did not create or assist in the creation of the nuisance, they can only be held liable if they acted unreasonably as possessors of the Property in failing to discover and abate the nuisance." *Id.* That case concerned whether the defendant was liable for a nuisance because it built a drain on its property—the property at issue—that ultimately allowed petroleum dumped by a neighbor on the neighbor's property to travel to the property at issue. Accordingly, because it was undisputed that the defendants had not released the petroleum, the Court's analysis ultimately focused on "whether the defendant *created or assisted in the creation of the nuisance*," by building the drain. *Id.* at 673. In finding that the defendants in *BNSF* did not create the nuisance, the Ninth Circuit emphasized that "conduct cannot be said to 'create' a nuisance unless

---

[9] There appears to be a lack of authority addressing the circumstances of this case in the context of private nuisance, where although there is no dispute as to the harm of the interference currently, there also appears to be no dispute that such interference would not have been considered harmful at the time that the conduct occurred. However, the Court does not find there to be any binding authority that instructs that the harm of the interference must be considered solely at the time that the conduct occurred. Therefore, the Court finds that the fact that the interference is undisputedly harmful now sufficient to satisfy an unreasonable interference under *BNSF*.

Although the Island Company argued at the hearing that *BNSF* misstates California law, the Court does not find this to be the case, and—in any event—is bound by the Ninth Circuit's holding. The Court also finds no support for the Island Company's contention that rather than follow the categorization set forth in the opinion, *BNSF* urges courts to "look at the totality of circumstances" in making the determination of whether this element of nuisance has been met.

1   it more *actively* or *knowingly* generates or permits the specific nuisance condition." *Id.* at 674

2   (emphasis added).

3       The Ninth Circuit also cited to a number of other cases where the defendant was not the party

4   that directly placed the contaminant on the property. For example, the Ninth Circuit cited to *County*

5   *of Santa Clara v. Atlantic Richfield Co.*, 137 Cal. App. 4th 292 (2006) which found liability for the

6   *promotion* of lead paint "with knowledge of the public health hazard that this would create," but not

7   for "mere manufacture and distribution of lead paint or their failure to warn of its hazards." *Id.* As

8   discussed in *BNSF*, the California Court of Appeals found that the manufacture or distribution did

9   not give rise to nuisance liability in part because products liability law was a better remedy. *Id.* at

10   680 n.2.

11       Similarly, the Ninth Circuit relied upon *Selma Pressure Treating Co. v. Osmose Wood*

12   *Preserving Co.*, 221 Cal. App. 3d 1601 (1990). In *Selma*, it was assumed that the property owner—

13   who dumped certain hazardous wood treating chemicals on the property—was liable for a nuisance.

14   *Id.* at 1607. The question was whether the cross-defendant—who sold the chemicals and the wood

15   treating technique which used the chemicals—was required to indemnify the property owner. *Id.* at

16   1619. The cross-defendant had helped the property owner install the equipment for use of the

17   technique, trained him in the use of the technique, and failed to warn him of the dangers of improper

18   disposal of the chemicals. *Id.* at 1609. The California Court of Appeals found that, under those

19   circumstances, the cross-defendant's "direct involvement in the design and installation of unsafe

20   disposal systems, coupled with its claimed knowledge of the dangers involved in such practices,

21   clearly could support liability based upon a finding that it created or assisted in" creating the

22   nuisance. *Id.* at 1620.

23       And finally, the Ninth Circuit cited to *City of Modesto Redevelopment Agency v. Superior*

24   *Court*, 119 Cal. App. 4th 28 (2004). In *Modesto,* the plaintiff alleged that harmful cleaning solvents

25   were dumped by certain dry cleaning businesses into sewer systems. *Id.* at 33. The California Court

26   of Appeals distinguished between the defendants which it found had assisted in creating the actual

27   nuisance and the defendants it found had only produced or supplied the cleaning solvents. *Id.* at 40.

28   The California Court of Appeals found that the defendants who instructed the dry cleaners to set up

their equipment to discharge solvent into the sewers could be liable, whereas defendants who failed to warn of the dangers of improper disposal but did not actually give any guidance on the disposal methods were not. *Id.* at 41–42 ("Here, any failure to warn was not an activity directly connected with the disposal of solvents.").

A review of these cases demonstrates that the Ninth Circuit focused on the defendant's state of mind only in these instances where it was clear that the defendant was not the party that placed the contaminant on the property. In contrast, the Ninth Circuit also discussed *California v. Campbell*—a case more analogous to the facts of this case—and did not discuss the state of mind of the defendant or its knowledge of the hazardous nature of the contaminant. 138 F.3d 772 (9th Cir. 1998). And a review of *Campbell* shows that although there is no discussion of the defendant's state of mind or knowledge of the hazardous nature of the contaminant—it was enough that it dumped hazardous materials into the ground. *Id.* at 776.

The Court notes that according to the Restatement of Torts, an invasion for purposes of nuisance is considered intentional if the actor either "acts for the purposes of causing it, or knows that it is resulting or is substantially certain to result from his conduct." Rest. 2d Torts § 825. In particular, while an invasion can be intentional even "without any desire to cause harm," the key consideration "is the knowledge that the actor has at the time he acts or fails to act." *Id.* The Court finds this consistent with the Ninth Circuit's analysis in *BNSF*, in that the actor must intend to commit the act and know that he is committing it, and must need to know that it is an interference (e.g., intentional dumping), but need not necessarily know that the interference is harmful (e.g., the material being dumped is hazardous).

Finally, the Court disagrees with the Defendants' contention that LBUSD's reading of the law creates a strict liability standard. MPA at 43; *see Lussier*, 206 Cal. App. 3d at 101 (explaining that although early nuisance law applied strict liability, the law has shifted such that "an actor is no longer liable for accidental interferences . . . but only for such interferences as are intentional and unreasonable or result from negligent, reckless or abnormally dangerous conduct"). A strict liability standard would mean that if a contaminant was found on the land, Defendants would be liable no matter who put it there or whether it was placed there intentionally. To the contrary, as the

discussion above makes clear, the theory which the Court is accepting for purposes of summary judgment and which is supported by case law is that the Defendants are liable because they intentionally placed the contaminants on the land.

The parties do not appear to dispute that the conduct at issue may not have been considered harmful or a nuisance at the time that such conduct occurred—indeed LBUSD emphasizes that many of the activities were common at the time. The Defendants rely on this to argue that their conduct—even if it occurred and even if it was intentional—was not unreasonable because they were neither aware nor should they reasonably have been aware of the actual harm of these actions. But the case law does not contain this requirement when a party is directly responsible for placing the contaminant on the land. *See BNSF*, 643 F.3d at 671 (citing *Selma*, 221 Cal. App. 3d at 1620, concerning a defendant who *did not engage in waste disposal*—"[The defendant's] alleged direct involvement in the design and installation of unsafe disposal systems, coupled with its claimed knowledge of the dangers involved in such practices, clearly could support liability based upon a finding that it created or assisted in the creation of a public nuisance."). Therefore, even if proven that Defendants' alleged conduct at issue was not and would not have been considered dangerous at the time, this fact would not be dispositive.[10]

Accordingly, the Court finds that Defendants have not met their burden in moving for summary judgment on this basis.

**B.    There is a material dispute of fact as to whether there is a continuing nuisance**

Defendants also move on LBUSD's claim as to continuing private nuisance. Under California law, a continuing nuisance allows for a "separate claim for damages" caused by that nuisance every three years. *See Mangini v. Aerojet-General Corp.*, 230 Cal. App. 3d 1125, 1143 (1991) ("*Mangini I*"). However, if a nuisance is permanent, a plaintiff is limited to a sole nuisance cause of action that must be brought within the three-year statute of limitations for nuisance claims.

---

[10] Nevertheless, the Court does find that whether the interference was substantial and unreasonable a triable issue for the jury. *See San Diego Gas & Electric Co.*, 13 Cal. 4th at 938 (substantiality is measured by the degree of harm, whereas unreasonableness is measured by "whether the gravity of harm outweighs the social utility of the defendant's conduct").

*Spaulding v. Cameron*, 38 Cal. 2d 265, 267–68 (1952). Whether a nuisance is continuing or permanent rests on determining whether it is abatable or not. *See Mangini v. Aerojet-General Corp.*, 12 Cal. 4th 1087, 1096 (1996) ("*Mangini II*"). To be abatable, the nuisance has to be able to be "remedied at a reasonable cost by reasonable means." *Id.* at 1103. Generally, a plaintiff may decide whether to treat a nuisance as permanent or continuing. *Baker v. Burbank-Glendale-Pasadena Airport Auth.*, 39 Cal. 3d 862, 870 (1985) ("The importance of the plaintiff's election has long been recognized.").

Here, the Court finds the main dispute between the parties to be whether or not, as a matter of law, a reasonable jury could find a continuing nuisance from a factual record that has no specific expert support. Defendants do not dispute that the parties have come up with a remediation plan that has been approved by DTSC which LBUSD asserts it is meeting. PSUF 64, 65. Defendants do dispute that cleanup standards set by a public agency can be sufficient to show abatability and a continuing nuisance—in the absence of an affirmative expert opinion. However, Defendants have not presented any binding authority from which the Court can find as a matter of law that abatability cannot be determined in the absence of an affirmative expert opinion. Rather, the California Appeals Court in *Capogeannis v. Superior Court* stated that it was "satisfied to presume that cleanup standards set by responsible public agencies sufficiently reflect expert appraisal of the best that can be done to abate contamination in particular cases." 12 Cal. App. 4th 668, 683 (1993). While Defendants note that the court also considered expert declarations in the case, the court did not rely on the expert declarations in reaching this conclusion about the cleanup standards set by public agencies. Accordingly, *Capogeannis* supports the view that a public agency's standards may be a reliable basis upon which to find abatability.

Defendants also attempt to distinguish the present case from *Mangini II*, where the California Supreme Court found that the "plaintiffs [could not] rely on any regulatory agency as setting the standard for abatement in *this case*." 12 Cal. 4th at 1098 (emphasis added). However, *Mangini II* was not holding as a general matter that regulatory agencies could never set the standard for abatement—specifically, in that case, the California Supreme Court noted that the plaintiffs had not submitted "evidence of cleanup levels acceptable to ordered by the regulatory agencies for [the

property at issue].” *Id.* (“The governmental investigation *has not yet reached* the point where a health risk assessment can be performed to determine acceptable cleanup levels for the particular site.”) (emphasis added). Here, it is undisputed that there is a remediation plan the parties already came up with, and DTSC already approved, specifically for the Site. Therefore, *Mangini II* supports the view that the custom standards approved by DTSC here may be sufficient.

The Court also finds it appropriate for the jury to decide, based on the evidence, whether such standards may be met at reasonable costs by reasonable means. Here, Defendants point to the fact that there is expert testimony that abatement would occur between 13 to 36 years and at a cost of $26 to 87 million. DSUF 56, 57. However, the Court does not find it necessary for an expert to declare that such figures are reasonable—rather, a jury could find whether such costs and means are reasonable. At a minimum, whether the nuisance is abatable is a matter of disputed fact, and therefore the Court finds that there is a dispute of fact as to whether the nuisance is properly categorized as continuing or permanent.

Accordingly, the Court denies summary judgment as to the continuing private nuisance claim.

### C. The Court grants in part LBUSD’s Motion for Partial Summary Judgment

LBUSD brings summary judgment against a number of Defendants’ affirmative defenses. For the reasons discussed below, the Court grants summary judgment as to the Island Company’s permanent nuisance defense, the Island Company’s unavoidable circumstance defense, the City’s indemnification and contribution defense, Defendants’ incorporation defense, Defendants’ reservation of rights defense, and the Island Company’s unjust enrichment defense. The Court denies summary judgment as to all other affirmative defenses moved on.

#### i. There is a material dispute as to the laches defense

LBUSD argues that a laches defense is inapplicable as it seeks monetary damages. However, it is clear from the Complaint that LBUSD seeks equitable relief in addition to monetary damages. *See* Compl., Prayer for Relief (requesting permanent injunction and declaratory judgment). LBUSD cites to California case law stating that laches is not an applicable defense where an action seeks monetary relief, even where joined with claims in equity. PMPA at 16; *see Reid v. City of San*

*Diego*, 24 Cal. App. 5th 343, 362 (2018)). But the case law LBUSD relies on merely holds that where the equitable relief sought is essentially seeking money damages, laches is not available. *See Reid*, 24 Cal. App. 5th at 363 (finding laches unavailable in declaratory relief action because the underlying claim was that the municipal defendant had imposed an unlawful tax and plaintiffs sought a legal remedy of the monies paid); *Wells Fargo Bank*, 32 Cal. App. 4th at 439 (finding that the declaratory relief sought was "essentially also a dispute regarding money").[11] It is undisputed that LBUSD seeks a permanent injunction requiring the Defendants to abate the nuisance identified separate from any monetary damages. *See* Compl., Prayer for Relief (seeking "permanent injunction requiring the Defendants to abate the nuisance"). This is *not* essentially just a dispute regarding money as in *Reid* and Wells Fargo; it is equitable relief separate from any monetary relief LBUSD seeks.[12] Therefore, the Court finds that a defense of laches is available to Defendants.[13] *Committee to Save Beverly Highlands Homes Ass'n v. Beverly Highlands Homes Ass'n*, 92 Cal. App. 4th 1247, 1266 (2001) ("The affirmative defense of laches may be applied to bar relief to a plaintiff who has delayed unduly in seeking *equitable* relief." (emphasis added)).

---

[11] LBUSD does not explicitly cite to *Wells Fargo Bank*, but the Court discusses it since it is relied upon by the court in *Reid*.

[12] At the hearing, counsel for LBUSD argued that the equitable relief it seeks is an abatement order which is in essence a monetary remedy, as it would require the creation of a fund to ensure the payment of any additional clean-up costs. LBUSD also cited to *People v. ConAgra Grocery Products Co.* for the proposition that the abatement fund would be a monetary remedy. 17 Cal. App. 5th 51 (2017). However, *ConAgra* actually supports the opposite—there, the California appellate court noted that "[t]he distinction between an abatement order and a damages award is stark." *Id.* at 132.

[13] LBUSD relies on a district court opinion in *Bd. of Trustees of Leland Stanford Junior Univ. v. Agilent Techs., Inc.*, No. 18-CV-01199-VC, 2019 WL 4729602, at *2 (N.D. Cal. Aug. 13, 2019) in support of its position that "[t]he doctrine of laches is not an affirmative defense to causes of action seeking monetary damages, even I there are also claims in equity alleged." PMPA at 16. But the court in that case found that the doctrine of laches did not apply to causes of action where the plaintiff sought *only* damages; as discussed above, LBUSD seeks damages *as well as* an injunction. *Bd. of Trustees of Leland Stanford Junior Univ.*, 2019 WL 4729602 at *2 ("The doctrine of laches cannot bar Stanford's trespass and nuisance claims. Stanford seeks *only damages* for these claims, and as Agilent and HP acknowledge, laches is inapplicable to claims for money damages." (emphasis added)).

1    Moreover, the Court finds that there is a genuine dispute of fact as to whether Defendants

2  could show prejudice resulting from an unreasonable delay in seeking relief by LBUSD. *See Magic*

3  *Kitchen LLC v. Good Things Internat., Ltd.*, 153 Cal. App. 4th 1144, 1161 (2007) ("A defendant

4  must demonstrate three elements to successfully assert a laches defense: (1) delay in asserting a right

5  or a claim; (2) the delay was not reasonable or excusable; and (3) prejudice to the party against

6  whom laches is asserted."). Here, it is undisputed that the Complaint was not filed until 2019, when

7  LBUSD first learned of possible hazards and contamination in either 1988 or 2011. P2SUF 1;

8  D2SUF 35, 36. Based on these facts, a jury could reasonably find a delay, as well as that such delay

9  was unreasonable.[14] Finally, "[t]he bare fact of delay creates a rebuttable presumption of prejudice,"

10  a presumption that LBUSD has not met its burden in rebutting in its Motion. *See Boone v.*

11  *Mechanical Specialties Co.*, 609 F.2d 956, 959 (9th Cir. 1979).

12    Accordingly, the Court denies summary judgment as to the laches defense.

13    ii.   There is a material dispute as to the statute of limitations defense

14    LBUSD moves on Defendants' statute of limitations defense because Judge Walters already

15  previously ruled on this defense, and found it to have applied. However, the Court does not find this

16  a reason to *dismiss* the defense—rather, it is a defense that currently applies to LBUSD's remaining

17  private nuisance claim. Therefore, as there is a continuing private nuisance claim going to trial per

18  the Court's ruling on Defendants' Motion, the restriction set by the statute of limitations previously

19  must also continue to apply.[15]

20    Accordingly, the Court denies summary judgment as to the statute of limitations defense.

21  _____

22  [14] Counsel for LBUSD also argued that a laches defense would undermine LBUSD's election to sue

23  immediately for permanent nuisance, or wait and sue for continuing nuisance. However, the Court finds this
    argument unpersuasive, as laches inherently allows for consideration of whether a delay was unreasonable.
    LBUSD's argument here essentially would lead to a laches defense never applying in the context of a

24  nuisance claim, but it has cited no authority that would support this result. Rather, California courts have
    applied laches to claims of continuing nuisance. *See O'Hair v. California Prune & Apricot Growers' Ass'n*,

25  130 Cal. App. 673, 677 (1933).

26  [15] At the hearing, counsel for LBUSD stated that LBUSD was not seeking dismissal of the statute of

27  limitations defense, but rather seeking confirmation of the scope of the defense. However, the Court does not
    find this was clearly sought in the papers, nor does the Court find this proper to address at the summary

28  judgment stage. As LBUSD does not contest that the statute of limitations defense continues to apply, the
    Court finds it appropriate to deny summary judgment to this defense on this grounds alone.

1     iii. <u>There is no material dispute as to the permanent nuisance defense</u>

2    LBUSD moves for summary judgment against the Island Company's defense of permanent

3 nuisance, to which the Island Company has stated it intends to withdraw this defense. PMPA at 26.

4    Accordingly, the Court grants summary judgment as to the permanent nuisance defense.

5     iv. <u>There is no material dispute as to the unavoidable circumstance defense</u>

6    LBUSD moves for summary judgment against the Island Company's defense of unavoidable

7 circumstance, to which the Island Company has stated it intends to withdraw this defense. PMPA at

8 27.

9    Accordingly, the Court grants summary judgment as to the unavoidable circumstance

10 defense.

11     v. <u>There is no material dispute as to the indemnification and contribution defense</u>

12    LBUSD moves on the City's affirmative defense of indemnification and contribution, citing

13 *J&J Sports Prods., Inc. v. Vizcarra* for the proposition indemnification is not an affirmative defense

14 but rather a direct claim. 2011 WL 4501318, at *3 (N.D. Cal. Sept. 27, 2011). However, the Court

15 notes that *J&J* cites to *Lloyd v. Jones Stevedoring Co.*, 490 F.2d 648, 650 (9th Cir. 1973) as the basis

16 for this proposition. *Id. Lloyd* was about a third-party indemnification action, and the Court does not

17 find it to be determinative on whether indemnification is a proper affirmative defense in the original

18 action. *See Lloyd*, 490 F. 2d at 648 ("After the longshoreman's suit against the vesse was settled by

19 compromise, the thirdparty action proceeded to trial."). Nevertheless, given that the City has already

20 pleaded a separate indemnification counter-claim against LBUSD, the Court finds that this

21 affirmative defense is moot. ECF No. 13 (City's Cross-Complaint), Fourth Claim for Relief.[16]

22    Accordingly, the Court grants summary judgment as to the indemnification and contribution

23 defense.

24   / / /

25   / / /

26

27 ―――――――――――――――――

28 [16] The City cites to a district court case arguing that it is entitled to setoff. PMPA at 28. The Court finds the
City's argument here to support its setoff defense rather than a separate indemnity defense.

vi.   <u>There is no material dispute as to the incorporation of other defenses</u>

LBUSD moves generally against any incorporation of another party's defenses. Defendants have clarified that the only defense at issue here is the City's incorporation of the Island Company's contributory and comparative negligence defense, of which it gave notice to LBUSD on August 15, 2023. PMPA at 29; P2SUF 31. Neither party nor the Court has identified any binding precedent on whether the incorporation of other defenses is appropriate as a standalone affirmative defense. However, "[t]he key to determining the sufficiency of pleading an affirmative defense is whether it gives plaintiff fair notice of the defense." *Wyshak v. City Nat. Bank*, 607 F.2d 824, 827 (9th Cir. 1979). LBUSD cites to a district court case where a defendant incorporated by reference all of the affirmative defenses alleged by any other defendant, to the extent applicable to him. *S.E.C. v. Keating*, 1992 WL 207918, at *5 (C.D. Cal. July 23, 1992). The court in *Keating* found this incorporation inappropriate because it failed to provide the plaintiff notice of the specific defenses being asserted. *Id.* The Court finds this situation analogous as here, the City only asserts that it is incorporating all "applicable" defenses, when it is the City's burden to identify which defenses are applicable to LBUSD. ECF No. 13 at 14.[17] Therefore, the Court GRANTS summary judgment as to the defense of incorporation generally.

However, the City has alternatively requested that it be allowed to amend its answer to plead a contributory and comparative negligence defense. PMPA at 29. Federal Rule of Civil Procedure 15 requires that leave to amend should be "freely given." Fed. R. Civ. Proc. 15(a)(2); *see also Foman v. Davis*, 371 U.S. 178, 182 (1962) (leave should be freely given "[i]n the absence of . . . undue delay, bad faith or dilatory motive . . . repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the oppositng party"). The Court finds that the City's request is made in good faith. At oral argument, counsel for LBUSD conceded that there would be no significant prejudice to it should the City be allowed to make this amendment at this stage. Accordingly, the

---

[17] On the other hand, SCIC's incorporation defense states that it affirmatively asserts "any" defense asserted by the City. ECF No. 10 at 26. The Court does not reach whether this would be sufficient to give LBUSD proper notice, as there is no incorporated defense at issue by SCIC.

1  Court GRANTS the City's request to amend its answer to add a contributory and comparative

2  negligence defense.

3          vii.  <u>There is no material dispute as to the reservation of rights defense</u>

4          LBUSD moves on Defendants' reservation of rights defense on the basis that it is not a

5  cognizable defense. *See e.g., Clean Safety, Inc. v. Ruby Trucking LLC*, 2021 WL 5935478, at *11

6  (C.D. Cal. July 27, 2021). Defendants do not challenge this point but merely indicate that they intend

7  to abandon this defense during preparation of pre-trial documents.

8          Accordingly, the Court finds that summary judgment is proper on the reservation of rights

9  affirmative defense.

10          viii.  <u>There is a material dispute as to the unclean hands defense</u>

11          An unclean hands defense "requires that a plaintiff 'shall have acted fairly and without fraud

12  or deceit as to the controversy in issue.'" *Northbay Wellness Group, Inc. v. Beyries*, 789 F.3d 956,

13  959 (9th Cir. 2015). The doctrine requires "balancing the alleged wrongdoing of the plaintiff against

14  that of the defendant." *Id.* at 960. LBUSD emphasizes that in particular, a party must show

15  "wrongfulness, willfulness, bad faith, or gross negligence." *Pfizer, Inc. v. International Rectifier*

16  *Corp.*, 685 F.2d 357, 359 (9th Cir. 1982). However, the Court finds that there are sufficient material

17  facts in dispute as to whether LBUSD acted wrongfully, such that there would be inequity. *See*

18  *Certified Nutraceuticals, Inc. v. Avicenna Nutraceutical, Inc.*, 821 Fed. Appx. 701, 703 (9th Cir.

19  2020) ("Unclean hands also 'requires a finding of inequitableness *or* bad faith.") (emphasis added).

20  Defendants have presented evidence as to whether LBUSD operated an incinerator on the Site and/or

21  burnt debris on it, it is undisputed that LBUSD also applied arsenical pesticides on the Site, and it is

22  undisputed that all of the contamination on the Ball Field was moved as part of LBUSD's grading of

23  the Ball Field. D2SUF 16, 20, 56, 57. The Court finds that it would be appropriate to balance the

24  relative wrongdoing of the parties in creating the nuisance here, as all the acts at issue directly relate

25  to the nuisance claim.

26          Accordingly, the Court denies summary judgment as to the unclean hands defense.

27  / / /

28  / / /

ix.   There is a material dispute as to the failure to mitigate defense

LBUSD moves on Defendants' failure to mitigate defense, arguing that there is no dispute of fact that its remediation efforts have been reasonable.[18] Nevertheless, the Court finds that Defendants have presented a material dispute of fact as to whether LBUSD could have taken steps to mitigate earlier. For example, Defendants have presented evidence that LBUSD was aware of the waste at the Site when it first began constructing the school, and kept building on contaminated areas knowing of the contamination. D2SUF 3, 4, 24. A reasonable jury could draw an inference that LBUSD's remediation efforts were not reasonable, and therefore could find a failure to mitigate.

Accordingly, the Court denies summary judgment as to the failure to mitigate defense.

x.   There is a material dispute as to the contributory negligence defense asserted by the Island Company

LBUSD moves on the Island Company's contributory and comparative negligence defense, arguing that the Island Company has conflated the defense with one of comparative fault.[19] Here, the Court does not find it material what the affirmative defense is titled, and finds that the Island Company's defense of contributory and comparative negligence fairly put LBUSD on notice of a comparative fault defense. *See F.D.I.C. v. Straub*, 2012 WL 1965621 at n.1 (N.D. Cal. May 31, 2012) (observing that the terms "contributory negligence, comparative negligence, and comparative fault describe the same affirmative defense" and that "California courts typically use the terms . . . as synonyms").

The comparative fault doctrine is a "flexible, commonsense concept, under which a jury properly may consider and evaluate the relative responsibility of various parties for an injury . . . in order to arrive at an 'equitable apportionment or allocation of loss.'" *Knight v. Jewett*, 3 Cal. 4th 296, 314 (1992). Here, the Court finds that the Island Company has presented sufficient dispute of material facts as to whether LBUSD was partly or wholly responsible for the contamination at issue.

---

[18] LBUSD does not actually present any facts in its Statement of Facts supporting its Motion on this issue.

[19] As discussed in Section IV.C.vi, *supra*, the Court declines to allow the City to incorporate this defense by reference.

Specifically, the Island Company has presented facts that lead impacts to the soil at the Site may
have been caused by lead paint that LBUSD itself used, LBUSD's own use of an incinerator or forge
may have caused or contributed to the contaminants, LBUSD used fill on the Site that contained
contaminants, and LBUSD may have moved the lampback on the Ball Field itself. D2SUF 50-72.
This is sufficient.

Accordingly, the Court denies summary judgment as to the contributory and comparative
negligence defense.

xi.   There is a material dispute as to the assumption of risk defense

An assumption of risk defense entails showing a "person's knowledge and appreciation of
the danger involved, and his voluntary acceptance of the risk." *Gomes v. Byrne*, 51 Cal. 2d 418, 420
(1959). The California Supreme Court has clarified that in cases involving a primary assumption of
risk, where a defendant owes no duty of care to the plaintiff, assumption of risk is a complete
defense. *Knight*, 3 Cal. 4th at 315 (1992). In cases involving a secondary assumption of risk, where a
defendant ows a duty of care to the plaintiff, "but the plaintiff proceeds to encounter a known risk
imposed by the defendant's breach of duty," assumption of risk is merged into comparative fault, at
which point a jury may consider relative fault in apportioning the loss. *Id.* As Defendants argue that
the defense here is part of the comparative fault scheme, the Court interprets that Defendants only
place at issue a defense involving a secondary assumption of risk. PMPA at 45.

Here, the Court finds that there are sufficient material facts in dispute of whether or not
LBUSD knew or should have known that there was contamination prior to beginning construction on
the Site. PMPA at 3, 4. Moreover, LBUSD only contests the defense related to secondary
assumption of risk on the same grounds as the contributory negligence defense. As the Court has
denied summary judgment on the contributory negligence defense, as explained above, the Court
also denies summary judgment as to the assumption of risk defense.

xii.   There is a material dispute as to the setoff defense

LBUSD moves against Defendants' setoff defense on the basis that Defendants have not
alleged any legal theory entitling them to recovery against LBUSD. However, Defendants have
brought counterclaims against LBUSD that, if successful, would allow them to recover against

LBUSD. D2SUF 43, 73. While LBUSD argues that Defendants have not provided sufficient evidence to support their pending counterclaims, the Court does not find it proper to conduct summary judgment on the actual counterclaims pleaded by Defendants against LBUSD, when such a motion has not been brought. The fact that Defendants have pleaded counterclaims that are pending currently and could recover from them is sufficient for a setoff defense, and such setoff, if any, would be applied pending final adjudication of all parties' claims. *See Newbery Corp. v. Fireman's Fund Ins. Co.*, 95 F.3d 1392, 1398 (9th Cir. 1996) ("The right of setoff . . . allows entities that owe each other money to apply their mutual debts against each other, thereby avoiding 'the absurdity of making A pay B when B owes A.").

Accordingly, the Court denies summary judgment as to the setoff defense.[20]

### xiii.   There is a material dispute as to the consent defense

The parties dispute whether consent is properly an affirmative defense, or an element of a nuisance claim. The Court finds that California cases have recognized consent as a defense. *See Mangini I*, 230 Cal. App. 3d at 1138 (noting that "consent as a defense is necessary to avoid absurd results," such as where a plaintiff leases property to a defendant for purposes of operating it as a quarry, and sues the defendant when the property was returned to them with a hole in the ground). Moreover, the Court finds that there is a material dispute of fact as to whether this defense applies. For the same reasons discussed previously regarding the contributory negligence defense, there is a material dispute of fact as to whether LBUSD was responsible for (and necessarily consented to) the contamination currently existing, in whole or in part.

While the Court appreciates that there could not have been any consent by LBUSD to any original contamination, the Court finds that the purchase of the Site with knowledge of these alleged contamination-causing activities happening on the property may, as a matter of law, also give rise to a consent defense. In *Beck Development Co. v. Southern Pacific Transportation Co.*, the California Court of Appeals found that where a defendant "conducted its activities on the property with the consent of the owner, itself, lawfully and in an open and notorious manner," and later sold the

---

[20] The parties do not place the related defense of recoupment at issue. Therefore, the Court does not address it.

property "in open view and with his full knowledge of the past usage of the property," the buyer "acquired no right to sue [the defendant] for private nuisance." 44 Cal. App. 4th 1160, 1214–15 (1996); *see also Tenaya Associates Ltd. Partnership v. U.S. Forest Service*, 1993 WL 13719146, at *6 (E.D. Cal. 1993) (noting that consent defense in a conflict between a buyer and seller of land properly accounts "for the interest of all parties"). Here, the Court finds it sufficiently in dispute whether or not the conditions giving rise to the nuisance would have been known to LBUSD when it bought the property. D2SUF 2, 3.

Accordingly, the Court denies summary judgment as to the consent defense.

> xiv.   There is no material dispute as to the unjust enrichment defense

LBUSD moves on the Island Company's unjust enrichment affirmative defense, to which the Island Company has responded that it intends to withdraw.

Accordingly, the Court grants summary judgment on the unjust enrichment defense.

## V.   **Conclusion**

For the foregoing reasons, the Court hereby ORDERS as follows:

1. Summary judgment is DENIED as to Defendants' Motion for Summary Judgment; and

2. Summary judgment is GRANTED IN PART as to Plaintiff's Motion for Partial Summary Judgment:

   a.   The Court denies summary judgment as to Defendants' laches defense;

   b.   The Court denies summary judgment as to Defendants' statute of limitations defense;

   c.   The Court grants summary judgment as to the Island Company's permanent nuisance defense;

   d.   The Court grants summary judgment as to the Island Company's unavoidable circumstance defense;

   e.   The Court grants summary judgment as to the City's indemnification and contribution defense;

   f.   The Court grants summary judgment as to Defendants' incorporation defense, but grants the City's request to add a contributory and comparative negligence defense;

   g.   The Court grants summary judgment as to Defendants' reservation of rights defense;

h.   The Court denies summary judgment as to Defendants' unclean hands defense;

i.   The Court denies summary judgment as to Defendants' failure to mitigate defense;

j.   The Court denies summary judgment as to the Island Company's contributory and comparative negligence defense;

k.   The Court denies summary judgment as to Defendants' assumption of risk defense;

l.   The Court denies summary judgment as to Defendants' setoff defense;

m.   The Court denies summary judgment as to Defendants' consent defense;

n.   The Court grants summary judgment as to the Island Company's unjust enrichment defense.


IT IS SO ORDERED.

Dated: December 27, 2023

_____

MAAME EWUSI-MENSAH FRIMPONG

United States District Judge