Gregory D. Trimarche (SBN 143686) gtrimarche@cookseylaw.com
**COOKSEY, TOOLEN, GAGE, DUFFY & WOOG**
A Professional Corporation
535 Anton Boulevard, Tenth Floor
Costa Mesa, California 92626-1977
Telephone: (714) 431-1100
Facsimile: (714) 431-1119

Attorneys for Defendant, Counterclaimant/Cross-Claimant
SANTA CATALINA ISLAND COMPANY

Joshua N. Levine, Esq. (SBN171840) jlevine@boothllp.com
Paul D. Rasmussen, Esq. (SBN 201680) prasmussen@boothllp.com
**BOOTH, LLP**
11835 W. Olympic Boulevard, Suite 600E
Los Angeles, CA 90064
Phone: (310) 641-1800
Facsimile: (310) 641-1818

Attorneys for Defendant, Counterclaimant/Cross-Claimant
CITY OF AVALON

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LONG BEACH UNIFIED SCHOOL DISTRICT,<br><br>Plaintiffs,<br><br>v.<br><br>SANTA CATALINA ISLAND COMPANY and CITY OF AVALON,<br><br>Defendants.<br><hr>AND ALL RELATED CROSS-ACTIONS | Case No.: 2:19-cv-01139-MEMF-AS<br><br>Hon. Maame Ewusi-Mensah Frimpong<br><br>**DEFENDANTS' SUPPLEMENTAL BRIEFING IN SUPPORT OF DEFENDANTS' MOTION IN LIMINE # 1 TO EXCLUDE, IN WHOLE OR IN PART, NEAL BRODY FROM TESTIFYING AS TO PLAINTIFFS PAST DAMAGES AND DEFENDANTS' MOTION IN LIMINE # 3 TO EXCLUDE PLAINTIFF FROM INTRODUCING IMPROPERLY DISCLOSED DAMAGES ; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT**<br><br>Complaint Filed:  February 14, 2019<br>Trial Date:             March 25, 2024 |

Defendant City of Avalon (the "City"), joined by Santa Catalina Island Company ("ICO"), (together, "Defendants") hereby submit the following supplemental briefing and evidence in support of their Motion In Limine # 1 to exclude Neal Brody from testifying as to Plaintiff's past costs (Dkt.

250) and Motion In Limine # 3 to exclude Plaintiff from introducing late disclosed damages and cost information. (Dkt 252). This briefing is submitted pursuant to the Court's Order re Supplemental Briefing (Dkt. 272).

DATED: February 14, 2024     COOKSEY, TOOLEN, GAGE, DUFFY & WOOG

By: _____
GREGORY D. TRIMARCHE
Attorneys for Defendant,
Counterclaimant/Cross-Claimant
SANTA CATALINA ISLAND COMPANY

DATED: February 14, 2024     BOOTH, LLP

By: _____*Joshua Levine*_____
JOSHUA N. LEVINE
PAUL D. RASMUSSEN
Attorneys for Defendant,
Counterclaimant/Cross-Claimant
CITY OF AVALON

**SUPPLEMENTAL MEMORANDUM OF POINTS AND AUTHORITIES**

**I.     INTRODUCTION**

Over the last two weeks, Plaintiff has provided--for the first time—the amount of its damage claim and the basis for it, along with 7300 pages of newly disclosed documents. This new disclosure and production both reinforces the basis of Defendants' prior motions in limine and provides further reasons for granting these motions:

First, the February 7, 2024, disclosure shows the deficiencies of Plaintiff's past disclosure as Plaintiff concedes that no Rule 26 damage disclosure was served between its initial disclosure on August 14, 2019, and February 7, 2024. Accordingly, the issue before the Court is now clarified—the question is whether Plaintiff is allowed to present evidence of damage claims at the upcoming trial that were not disclosed until February 7, 2024.

Second, the new disclosure definitively demonstrates that Plaintiff's prior (but still late) disclosure of invoices does not fill the role of a disclosure as the productions did not inform Defendants of what, out of the hundreds of thousands of pages of documents, were relevant to Plaintiff's damage claim. Of the approximate $24 million dollars of invoices that were produced in this matter, Plaintiff has now disclosed that their damage claim is approximately $4 million of that invoicing—i.e., only 18 percent of its production reflects costs at issue   Defendants would have no way to know what Plaintiff believed was at issue before the February 2024 disclosure.

Third, the February 2024 disclosure also puts to bed the notion that it is easily ascertainable from the invoices themselves what is part of Plaintiff's damage claim, and that Plaintiff's expert Neal Brody can act as a fact witness to simply tabulate the amount of remediation invoices. Again, over eighty percent of the costs listed on the documentation are not relevant, and someone, using some undisclosed  assumptions, discretion, and judgment, had to pick out what was relevant from what was not. There is nothing on the invoices themselves that conclusively show whether or not a particular invoice relates to remediation.   Much of the claimed invoicing does not even mention remediation or environmental issues. Moreover, for a large portion of the invoices, Plaintiff concedes that only small portions of the invoicing are recoverable. Someone had to go through and

1 make judgment calls as to what portions of the invoices were relevant. This decision making
2 process requires specialized knowledge and discretion.
3       Fourth, the February 2024 disclosure also highlights that the issues going to the late
4 productions go to the vast majority of the damage claims. Plaintiff's initial disclosure only provided
5 a miniscule amount of the underlying invoices that now make up its damage claims. Roughly
6 seventy percent of the cost documentation that Plaintiff is now relying on for its damage claims were
7 not provided by Plaintiff until long after the close of discovery, including roughly $1.4 million in
8 cost documentation that was produced within the last two weeks.
9       The February 2024 disclosure is the type of disclosure that should have been made long
10 before the close of discovery. If it had, Defendants would have been able to respond to Plaintiff's
11 damage claims, including taking discovery and preparing appropriate expert opinions. Giving
12 Defendants this information for the first time, shortly before trial, is manifestly prejudicial.
13 Accordingly, the late disclosure and post-discovery productions should be excluded, and Plaintiff
14 should not be allowed to put on a non-disclosed allocation opinion by its expert Neal Brody
15 regarding how much of these invoices constitute remediation costs. Alternatively, if the Court is
16 inclined to allow this late and prejudicial information, trial should be continued and Defendants be
17 allowed to conduct limited discovery and introduce limited rebuttal expert opinions in order to
18 address the extreme prejudice caused by this late disclosure.

19 **II. SUPPLEMENTAL FACTS**

20       Defendants filed their Motions In Limine ("MILs") on January 10, 2024 (Dkt 250) and
21 hearing was set for the MILs on February 8, 2024. (Dkt. 267). On February 1, 2024, Plaintiff
22 served an additional document production. (Declaration of Joshua Levine ("Levine Dec."), ¶ 4).
23 Plaintiff followed up this production with a further production on February 7, 2024, and two further
24 productions on February 8, 2024 (the morning of the MIL hearing). (Levine Dec., ¶ 4). All told,
25 Plaintiff, between February 1 and February 8, 2024, produced 7,306 pages of new damage
26 documentation (containing roughly $1.4 million in invoices going back to 2022) as well as 333
27 pages of previously produced information with newly revised redactions. (Levine Dec., ¶ 4).
28

1  During the same time period, Plaintiff, for the first time, disclosed its damage claim. On
2  February 7, 2024, Plaintiff provided a "Summary of District's Costs" (the "Summary"), with a cover
3  e-mail indicating that the Summary "serves as [Plaintiff's] amended Rule 26 damages disclosure."
4  (Levine Dec., Ex. A). The Summary, for the first time, disclosed the amount of Plaintiff's damage
5  claim and identified the portions of invoices that formed the basis for this claim. (Levine Dec., ¶ 5
6  and Ex. B).

7  **III. DISCUSSION**

8  **a. Plaintiff has conceded that it did not disclose its damages until February 2024.**

9  In prior briefing, Plaintiff dodged the question of when it had disclosed its damages. The
10 February 7, 2024, disclosure definitively answers this question—Plaintiff is relying on an amended
11 Rule 26 damage disclosure served on the evening of February 7, 2024, roughly six weeks before
12 trial. Prior to that time, the only document served by Plaintiff purporting to be a Rule 26 damage
13 disclosure was the initial disclosure served on August 14, 2019, which identified its damage claim as
14 being based on a concurrent document production. (Dkt. 252-3). Between the August 2019 Rule 26
15 Disclosure and the February 26, 2024, Disclosure, Plaintiff served nothing that purported to be a
16 Rule 26 amended damage disclosure. (Levine Dec., ¶ 6).

17 **b. The February 7. 2024, Damage Disclosure Demonstrates That Most Of The Underlying**
18    **Invoices Plaintiff Is Relying Upon Were Not Provided Until After The Close Of Discovery**

19 Plaintiff claims $4,167,526.40 in damages. In its initial disclosure, it pointed to its
20 concurrent production of invoices as reflective of its damage claim. Only $2,610 of Plaintiff's
21 present damage claim is based on invoices in that production. (Levine Dec., ¶ 7). In March 2023,
22 long after discovery closed, Plaintiff produced several thousand pages of invoices (though still
23 without a damage disclosure), representing invoicing incurred past 2019. Based on the Summary,
24 Plaintiff is now claiming $1,974,511 in costs based on this invoicing. (Levine Dec., ¶ 7). In its
25 February 2024 production, Plaintiff produced another 7,300 pages of invoicing, and is now claiming
26 $837,301 in additional remediation costs (including additional costs from 2022) based on this recent
27 disclosure. (Levine Dec., ¶ 7) All told, Plaintiff did not produce documentation in support of $2.8
28

million of its $4.1 million damage claim (68 percent) until long after the close of discovery. (Levine Dec., ¶ 7).

### c. The February 7, 2024, Disclosure Demonstrates That One Cannot Calculate Plaintiff's Damage Claim Merely By Totaling Up The Invoices.

Plaintiff's February 2024 Disclosure acknowledges for the first time that the vast majority of the invoice information produced by Plaintiff in this case does not relate to remedial costs. Plaintiff has produced several hundred thousand documents in this case, including approximately $24 million in invoicing for the period from February 2016 to the present, but provided no indication until last week of what portion of these documents Plaintiff contended to be a recoverable damage. On February 7, 2024, Plaintiff revealed for the first time that it believed that $4,167,526.40 of the invoicing represented remedial costs--in other words, only roughly 17.7 percent of the post February 2016 cost information supplied by Plaintiff was relevant to its claim. (Levine Dec., ¶ 8, Ex. B at p. 13).

The fact that Plaintiff's damage claim significantly varies from the underlying cost information is important for two reasons. First, this discrepancy conclusively repudiates any argument that the damage numbers are readily ascertainable from the invoicing itself, and that the prior production of invoices can be construed as de facto damage disclosures. Rather, Defendants would have had no way of knowing what Plaintiff was claiming was a recoverable cost claim merely from looking at the invoicing as there was nothing on the invoicing itself that shows what portion (if any) Plaintiff claimed was a recoverable cost. Such late disclosure significantly hampered Defendants' ability to respond to Plaintiff's damage claim. Having not known what specific damage items were being claimed, Defendants had no ability to conduct discovery as to these damage claims or prepare an expert report to rebut such claims.

Second, the discrepancy between the claim amount and the invoicing also repudiates the argument that Plaintiff's expert Brody would merely be "adding up invoice payments in a spreadsheet" using his "basic familiarity with arithmetic and excel". (Dkt. 264:22-24). The determinations which were made to allocate what part of these invoices relate to recoverable costs is

not something that can be done based on the face of an invoice by a lay witness, but instead requires specialized knowledge on the part of whomever is making that determination.

The following are a few examples of the difficulty in determining, from the face of the documents alone, what portion of the cost documentation is relevant to Plaintiff's cost claim:

### i. 2H Construction

The Summary shows that of $4,337,846.86 of 2H Construction invoicing that was provided, only $567,950.16 is claimed to be relevant to this damage claim. (Levine Dec, Ex. B at p. 1). If one reviews the individual invoices, the difficulty of ascertaining what is a remediation cost on a particular invoice becomes apparent. As example, the Summary claims that $32,597.03 of a 10/31/2022 invoice is a remediation cost. (Levine Dec., Ex. B at p.1). The referenced 10/31/2022 invoice consists of a one page invoice for $1,390,151.24, with 32 pages of back-up documentation. (Levine Dec. ¶ 9, Ex. C). Nothing on the face of this invoice suggests that it is relates to remediation work; rather, on its face, it describes the project as "Avalon HVAC, Baseball Field, and Soil Improvements", suggesting that the project relates to the non-environmental projects that Plaintiff has recently implemented at the School, including work on the School's HVAC system and the replacement of the School Ballfield with artificial turf. (Levine Dec. ¶ 8, Ex. C at LBUSD_LP00466000). The claimed $32,597.03 figure appears on this document at LBUSD_LP00466004, where, on a page entitled "Avalon HVAC Scope", there is an entry for "Earthwork-Allotment" that matches up to this amount. (Id.). Somehow Plaintiff selected this one entry, which appears on its face to relate to Earthwork for the HVAC project and not remedial work, as relating to remedial work. If Brody is the one who made this determination, he either made it through some undisclosed expert methodology or he had some undisclosed percipient information. Either way, there was no way for Defendants to make this determination on their own, and thus they did not have an opportunity to conduct discovery on or rebut this claim.

### ii. Arcadis

The Summary shows that of the $5,137,148.02 in Arcadis invoicing that was provided, only $470,496.17 is claimed to be relevant to this damage claim. (Levine Dec, Ex. B at p. 4). If one

1  reviews the individual invoices, it is impossible to determine how Plaintiff arrived at this particular

2  amount.  As example, the Summary claims that $9,240.00 of a 10/10/23 invoice from Arcadis is a

3  remediation cost.  (Levine Dec., Ex. B at p. 4).   The referenced invoice, which was first produced

4  last week, is a 13-page invoice, which references projects in numerous places other than Avalon.

5  (Levine Dec., Ex. D).    Defendants have attempted, but are yet unable, to match up the claimed

6  amounts to particular entries within the invoice.  (Levine Dec.. ¶ 9).

### iii. Avalon Freight Services

8  The Summary claims that the entirety of Avalon Freight Services ("AFS") charges (totaling

9  $172,015.66) is for remediation services.  (Levine Dec, Ex. B at p. 4).  The underlying invoices,

10 however, generally reference projects other than remediation.  As example,  the 7/31/23 invoice

11 from AFS is for the transport of "1 Roll Off Truck." (Levine Dec., Ex. E at LBUSD_LP00475071).

12 It does not state that it is for environmental remediation; rather it indicates that the costs are "for the

13 Avalon Ballfield Project"  (Levine Dec., Ex. E at LBUSD_LP00475073).  At the time of this

14 invoice, the District was in the process of replacing its ballfield with artificial turf.   Had Defendants

15 known that the charges of AFS were part of Plaintiff's damage claim, it could have conducted

16 discovery in order to determine what AFS did and whether this work related to environmental

17 contamination or the artificial turf project or both.   Plaintiff's failure to disclose this damage claim

18 prevented Defendant from conducting such discovery.

### iv. Capital Program Management

20 The Summary claims that $33,190.00 of the $1,335,452,00 of Capital Program Management

21 ("CPM") invoicing relates to remediation, but nothing in the invoicing itself would lead to this

22 determination. (Levine Dec, Ex. B at p. 5).   As example, the Summary categorizes $2,475 of CPM's

23 8/7/20 invoice as a remediation cost.  (Id.)  The CPM invoicing does not reference environmental

24 remediation; rather, its describes the services as "To provide various program support services such

25 as estimating project management scheduling and other related services for construction projects

26 throughout the District." (Levine Dec. , Ex. F at LBUSD_LP00465275).  The $2,475 number

27 appears to come from a line item relating to "Avalon Baseball Field". (Levine Dec. ¶ 12, Ex. F at

28

8

1 LBUSD_LP00465261).   However, there is nothing on the invoice itself that would suggest that it
2 relates to environmental remediation, rather, it appears to relate to the rebuilding of the Baseball
3 Field.  Again, Brody would have to do something more than just tabulating costs in order to identify
4 this one cost as relating to environmental remediation.

> **v. Catalina Express**

6 The Summary attributes the entirety of Catalina Express trips to environmental remediation
7 (Levine Dec, Ex. B at p. 5), but the underlying invoices cover trips for numerous activities, not just
8 environmental remediation.  As example, the 9/14/22 Catalina Express invoice is for 180 "roundtrip
9 commuter tickets for boat travel to and from Avalon for MOVE team, IT Team, PM/CM,
10 Environmental Team, and Management Team." (Levine Dec., Ex. G at LBUSD_LP00475097).
11 According to the invoice, the cost is allocated $8,350 and $6,680 to the "Move Team." (Levine Dec.,
12 Ex. G at LBUSD_LP00475092).   Plaintiff did not disclose this invoice until last week, much less
13 disclose its claim that the entirety of Catalina Express invoicing was a remediation cost, thus
14 depriving Defendants the ability to perform discovery on the connection between these invoices and
15 remediation.

> **vi. Chambers**

17 The Summary attributes the entirety of Chambers invoicing to environmental remediation.
18 (Levine Dec, Ex. B at p. 5).   This Chambers invoicing is for "CEQA Services " for archaeological
19 monitoring and processing for the "Avalon Ballfield Project." (Levine Dec, Ex. H at
20 LBUSD_LP00479049).  On its face, this appears to be standard archeological monitoring that is
21 required under CEQA for large projects like the replacement of the Ballfield with artificial turf.   To
22 the extent that Brody intends to opine that these costs are environmental remediation costs, such an
23 opinion would either be an expert opinion or would rely on some undisclosed evidence.   In any
24 event, Plaintiff did not disclose until last week that it intended to include the entirety of
25 archeological monitoring--even CEQA monitoring for the ball field replacement—as a cost and have
26 thus prevented Defendants from performing any discovery on this issue.

27
28

### vii. Kizh Nation Resource Management

The Summary attributes the entirety of Kizh Nation Resources Management invoicing- $154,574--to environmental remediation. (Levine Dec, Ex. B at p. 5).   The Kizh Nation Resource Management invoices do not reference environmental remediation on their face--rather, the invoicing reference non-environmental activity such as "Tribal Monitoring for the Avalon Field Project" and includes descriptions of monitoring of the demolition of a "bathroom building" and laying down "straw waddle along the edges of the ballfield to create a berm."  (Levine Dec., Ex. I at 479387, 479389).   A lay witness would not be able to tell on the face of these invoices that they had any connection to environmental remediation.

While due to space limitations, this brief discusses only seven examples of the difficulty of linking the invoicing to remediation, the same difficulty can be found through the majority of documentation identified by Plaintiff as supporting its damage claim.  (Levine Dec., ¶ 16).

**d.  Defendants would be severely prejudiced if Plaintiff is allowed to pursue its newly disclosed damage claims.**

Plaintiff, in its February 7, 2024, damage claim, significantly amended its prior damage claim.   Not only did the amount of Plaintiff's damages exponentially increase, but the types of damages that it sought expanded to encompass categories beyond those incurred to perform the DTSC approved remedial work.  Plaintiff now claims that much of the costs incurred during its implementation of non-environmental projects such as the replacement of the ball field and HVAC work is recoverable, including tribal monitoring, transport, and soil management plan compliance. These claims raise qualitatively different issues than a claim limited to environmental response costs.

Defendants have not had the opportunity to respond to these new damage claims.  Had the damage disclosure and damage documentation been timely disclosed, Defendants would have been able to respond to Plaintiff's actual claims, including taking discovery and preparing responsive expert opinions.  Defendants could have subpoenaed the various vendors (or taken targeted depositions) in order to find out more information as to the nature of the services provided (e.g., what services were actually provided by 2H Construction for Avalon).  Defendants could have sent

1  out interrogatories to Plaintiff for information allowing them to interpret these invoices (e.g. who is

2  the "MOVE team" referenced in the Catalina Express invoices).  If Plaintiff had provided its cost

3  calculations to Defendants before they took the 30 (b) (6) deposition of Plaintiff on Plaintiff's

4  damage claim, then Defendants could have asked the deponent to explain why certain costs were

5  included.

6       Defendants would also, had there been a timely disclosure, been able to have their experts

7  opine on the damage claims.  Defendants' experts may have been able to opine whether certain

8  categories of costs (e.g., the Tribal Monitoring) relate to the contamination.   Defendants' experts

9  may have been able to opine on whether the claimed costs were  reasonable, or whether Plaintiff's

10 allocation of portions of invoices were correct.   They also may have been able to offer opinions

11 connecting particular costs to particular contamination, potentially segregating out costs relating to

12 the operation of the MGP plant from costs relating to the abatement of lead paint from Plaintiff's

13 school buildings.  However, as Plaintiff never provided a damage disclosure indicating what costs

14 they believed were at issue, Defendants never had an opportunity to have their experts challenge

15 these costs.

16      This failure by Plaintiff is extremely prejudicial to Defendants.   At trial, Plaintiff intends to

17 put on their expert Brody as a "non-expert" who presumably will testify as to his belief that the cost

18 allocation on the Summary accurately reflects costs incurred by Plaintiff due to contamination.

19 Defendants having not known of Brody's allocation or seen the underlying invoices prior to the

20 close of discovery will have to do "discovery on the stand" as to why Brody believes a particular

21 invoice cost qualifies as recoverable.   As Defendants did not have Brody's cost allocation or have

22 access to the underlying cost documentation at the time that they designated experts, and thus could

23 not disclose opinions challenging Plaintiff's costs, Defendants will not be able to put experts of their

24 own to rebut Brody's allocation and the only testimony about damages provided to the jury will be

25 Brody's.

26      With trial six weeks away at the time of the damage disclosure, Defendants are in the process

27 of concurrently analyzing these newly disclosed damage claims and underlying documents, while

28

preparing for trial.   In addition to the prejudice discussed due to Defendants' inability to conduct discovery or prepare expert opinions relating to this late disclosure, the late disclosure significantly impacts Defendants' ability to prepare for trial as they need to re-evaluate their approach to trial preparation, including their pre-trial filings.

**e. Alternatively, the Court should grant a short continuance and allow Defendants leave to perform limited discovery in light of Plaintiff's late disclosure.**

Defendants believe that exclusion of the late produced damage claims and information is not only warranted, but indeed the only appropriate course of action to prevent the severe prejudice to Defendants described above.  However, if the Court is inclined to allow this wholly improper and prejudicial late disclosure and allow the introduction of documents not produced until the eve of trial, long after the close of discovery, Defendants request at a minimum the following measures to help mitigate the damage:

(1) trial be continued 120 days;

(2) Defendants be allowed to conduct limited discovery on the damage claims over the next 90 days, and;

(3) Defendants' experts could offer opinions at trial in rebuttal to the February 2024 Disclosure.

**IV.    CONCLUSION**

Plaintiff should be precluded from putting on damage claims not disclosed until the eve of trial, relying on documents not produced until after the close of discovery, and should be precluded from having its expert Neil Brody testify as to his non-disclosed opinion as to what costs he believes are related to remedial activity.  At the very least, in order to mitigate the prejudice to Defendants, the Court should continue the trial for 120 days and allow Defendants to conduct discovery and offer opinion on the newly disclosed damage claims.

///

///

///

| | | |
|---|---|---|
| 1 | DATED: February 14, 2024 | COOKSEY, TOOLEN, GAGE, DUFFY & WOOG |
| 2 | | |
| 3 | | By: _____ |
| 4 | | GREGORY D. TRIMARCHE |
| | | Attorneys for Defendant, |
| 5 | | Counterclaimant/Cross-Claimant |
| | | SANTA CATALINA ISLAND COMPANY |
| 6 | | |
| 7 | DATED: February 14, 2024 | BOOTH, LLP |
| 8 | | |
| 9 | | By: _____*Joshua Levine*_____ |
| 10 | | JOSHUA N. LEVINE |
| | | PAUL D. RASMUSSEN |
| 11 | | Attorneys for Defendant, |
| | | Counterclaimant/Cross-Claimant |
| 12 | | CITY OF AVALON |